## Case No. 15,143.
### UNITED STATES v. FOULKE.
[6 McLean, 349.] [1]

Circuit Court, N. D. Ohio. April Term, 1855.

CRIMINAL LAW—REASONABLE DOUBT—WHAT IS—EMBEZZLEMENT FROM MAIL.

1. The jury are to weigh the evidence in every case, and where there is a conflict in a criminal case which creates reasonable doubt, they will acquit the accused.

2. These doubts should not arise from our sympathies or hopes, but from a deliberate consideration of the evidence.

Mr. Morton, U. S. Dist. Atty.
Mr. Upton, for defendant.

OPINION OF THE COURT. The defendant stands charged, gentlemen of the jury, with stealing a letter out of the mail containing money, he being a post-master. Mr. Chapman, who acts as special agent for the post-office department, states that the defendant was post-master at Moultrie, situated on the railroad to Cleveland. The witness mailed a letter at New Franklin post-office, Stark county, addressed to the post-master at Osnaburg, with a request that it should be returned to Cleveland. There was but one office, Paris, between New Franklin and Osnaburg. The letter contained a ten dollar bank note. This letter was received by the post-master at Osnaburg, which is thirteen miles west of Moultrie. Mr. Koons, the post-master at Osnaburg, states that he received the letter from Chapman and forwarded it the next day, the 21st July, to Cleveland. It had to pass through Paris and New Franklin before it reached Moultrie post-office, on the railroad. The letter was directed to one Milton, Cleveland, requesting him to make and forward to the writer a plow. A fictitious name was signed to the letter. Mr. Chapman states that on the evening of the 21st of July, he received from Cleveland, by the conductor of the train, the same ten dollar note he enclosed in the above letter. The post-master of Paris, which was the first office after it left Osnaburg, states that he took, on the 21st, no letter out of the mail which was not directed to his office. The post-master at New Franklin also stated that he took no letter out of the mail which was not directed to his office. The next was the Moultrie office. Mr. Cleland, the conductor of the train, states that, on the 21st of July, the defendant was post-master at Moultrie, and kept a tavern. He generally received the mail from the cars and changed it. On the above day, the defendant asked him to change a ten dollar bill, as he wanted small bills, and the witness gave him smaller notes for the bill which he identified, and that was the bill which he on the same day handed to Chapman, the agent of the post-office de-

[1] [Reported by Hon. John McLean, Circuit Justice.]

partment. Mr. Grey, assistant post-master at Cleveland, was requested by Chapman to look for the letter he had caused to be forwarded, which he did on the evening of the 21st of July, and for several evenings afterwards, but no such letter has been received at the Cleveland post-office. Mr. Meeker was present when Cleland, the conductor, changed the bill at the request of the defendant. Cleland at first objected to the bill as not good, but Foulke assured him it was good and that he would be responsible for it. Mr. Arnold saw Cleland and Foulke talking together on the above day, but did not hear the conversation.

Defendants' witnesses: Mr. Randolph, being called by the defendant, states that he saw defendant on the 21st of July, 1853, in Chambersburg. He was arrested about the 9th of August. On the 21st he saw A. Koons, the post-master at Osnaburg, at Root's, in Chambersburg. Mr. Root came across the street and spoke to defendant, taking him out of the crowd. Witness saw they had money passing between them, and the witness says the defendant got a $10 bill of Root, in the presence of three or four persons who witnessed the exchange. The bill received by Foulke was doubted at first. The witness had the $10 bill in his hand. The bill had two crosses near the letter B. The bill being presented to the witness, he believes it to be the same. Samuel Loder was at Chambersburg on the eve of the 21st or 22d of July, 1853, and heard Randolph, Foulke and Harris talking together, witness being present. They talked about the ten dollar bill. Witness on looking at it thought it was not good. He saw Root in close proximity with Foulke. Witness thought the bill was not good. Witness has known Root five years. Witness stood near Randolph. Mr. Harris was at Chambersburg on the 22d or 23d of July. He thinks Loder took up some work. Witness lived with Loder. Witness saw Mr. Root come down, call Foulke out and change some money with him; handed the bill to Randolph; Foulke had the note, but does not know the size of it; and witness saw Foulke give change for the note; heard Mr. Randolph say it was a base counterfeit. Mr. Thomas lives in Chambersburg. On the 22d of July, 1853, had some hands at work who came to his house on the same evening, and he made an entry of the date as above. Witness saw a bill in the hands of the defendant, who said it did not look like a good bill. Root said if it were not good he would make it good. Witness did not examine the bill, and did not know the amount of it. On the same evening a wagon and sulky were taken away by Mr. Randolph. Joseph Estel was the mail carrier about five months, and was the carrier at the above time, three times a week each way—Tuesdays, Thursdays and Saturdays. Mr. Lever, Mr. Wallace, John McClury, Wm. H. Gill, Wm. W. Hamilton, Charles M. Austin, Judge Riddle, Joseph H.

Quinn and Mr. Aster were sworn, all of whom testified to the good character of the defendant. They represented him as having filled various responsible trusts, and exercising great influence with the people of his county.

The plaintiffs called some rebutting witnesses. Mr. Root says he is the brother-in-law of Koons; that he had some dealings with the defendant the latter part of May or the beginning of June; bought a horse from defendant; paid thirty dollars, and gave a note for the balance; that he sold goods, and had more accounts against the defendant. Chambersburg was only a few miles from Moultrie. Mr. Koons says he was not at Chambersburg on the 21st of July; that he was there on the 20th, and a short time afterwards; that he never promised Root to change a bill for him with the defendant.

The defendant then called Mr. Eustine, who says, he heard Root say he had changed with Foulke a ten dollar bill, which was suspected; and that he promised to make it good if it were not so.

This is the substance of the testimony, gentlemen; and it is your duty to consider it well, and to come to a decision as to the guilt or innocence of the defendant. If the postmasters of Osnaburg and New Franklin have sworn truly, the letter was mailed at Osnaburg, and, passing through the New Franklin office, in all probability was received at the Moultrie office: and, if the conductor of the train, Mr. Cleland, and the post-office agent, Chapman, remember correctly, the note which the latter endorsed to test, as he says, the Moultrie office, was received by the conductor from the defendant on the 21st of July, and handed by him to Chapman, the agent, on the same day. And, as the conductor was apprised by the agent of the experiment, both he and the agent would necessarily charge their memories with the facts and the date. These witnesses are not impeached.

The defense rests mainly on the fact alleged, that the identical note was received by the defendant from Roth on the 21st of July, the same day the conductor received the note from the defendant. The witnesses vary somewhat as to the time the note was received by the defendant from Roth. It was sometime in the afternoon. Now, if this note was not received until after the cars had passed the Moultrie office, the defense must fail. Chambersburg is but a short distance from Moultrie. Supposing the note received from Roth was the identical note passed to the conductor by the defendant, there is no question that he must have received it from Roth, and returned to his office before the cars arrived. It is said that the daughter of the defendant, in the absence of her father, generally opened the mail.

The attempt is openly avowed to implicate Mr. Koons, the postmaster at Osnaburg, in this transaction. The letter in question was enclosed to Mr. Koons by Chapman, open, and

he stated the object. It is then suggested that Koons had the power to abstract the letter, hand it to his brother-in-law, Roth, who passed it off to Foulke with the view of entrapping him. Mr. Koons was not suspected by the agent of the postoffice department, nor is there any evidence, beyond what you have heard, to cause suspicion against him. Koons swears he was not at Chambersburg on the 21st of July, and the same is corroborated by the oath of Roth, his brother-in-law; and one or two of the other witnesses state, that it was on the twenty-second or third that the ten dollar note was passed to Foulke by Roth. But, several of the witnesses say that the note was passed to the defendant on the 21st; and they identify the note now presented to them by a mark which was observed at the time; and here, too, the witnesses state facts which would be likely to remain impressed upon their memory. The note was minutely examined by Mr. Randolph and others, as it was suspected to be a counterfeit; and several of them, on looking at the note now, are able to identify it by certain marks which were observed when they saw it at Chambersburg.

If this evidence be false, it has been most ingeniously contrived. But, such a supposition most seriously implicates the defendant's witnesses, who have not been impeached, and who appear to be respectable. It will be your duty, gentlemen, to reconcile the testimony if you can; but, if this can not be done, it will become your painful duty to weigh the facts, and decide where the truth lies. By a large number of respectable witnesses the defendant has shown a good character. This the law permits, from the infirmity of human testimony, and for the safety of the accused. Where an individual has so acted as to secure the confidence and good feeling of his neighbors, and of those with whom he has had intercourse or business, he will not be supposed, except upon the clearest evidence, at once to abandon so desirable an inheritance. There may be such instances, but they form exceptions to the general rule.

You, gentlemen, are to judge of the weight of evidence, and the credibility of witnesses. There is no tribunal but that before which we must all appear, which can rightly judge of the motives of human action. We have no such standard; and, at best, we can only determine matters of controversy, civil and criminal, on the highest probability of facts, from the evidence. But, in every criminal case, where a conviction is utterly ruinous to the accused, a jury will acquit, if they have reasonable doubts of his guilt; but, these doubts must not arise from our sympathies, but from a deliberate consideration of the evidence.

The jury found the defendant not guilty.